IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>$110,000.00 IN UNITED STATES CURRENCY,<br><br>    Defendant. | Civil No. 8:19CV531<br><br>**COMPLAINT FOR FORFEITURE *IN REM*** |

The United States of America, for its cause of action against the defendant property pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, states and alleges as follows:

1. This is an action to forfeit property pursuant to 21 U.S.C. § 881 due to violations of 21 U.S.C. § 841(a).

2. The defendant property consists of $110,000.00 U.S. currency seized on June 18, 2019, from a rented Chevrolet Suburban occupied by Julio J. Martinez and Ali M. Abbasi, after a traffic stop on Interstate 80 near mile marker 398, Lancaster County, Nebraska.

3. The U.S. Marshals Service, currently has custody of the defendant property in Omaha, Nebraska.

4. This Court has subject matter jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action pursuant to 21 U.S.C. § 881.

5. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

7. The defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, 2) proceeds traceable to such an exchange, and/or 3) money, negotiable instruments and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## Facts showing entitlement to relief

8. On June 18, 2019, Nebraska State Trooper Rob Pelster saw a silver Chevrolet Suburban driving in excess of the 65 mph speed limit in the middle lane of westbound I-80.

9. Trooper Pelster used his radar unit and recorded a reading of 71 mph.

10. Trooper Pelster caught up to the Suburban at mile marker 403 and saw the Suburban pull in behind a maroon sedan at an unsafe distance, getting as close as two (2) car-lengths behind the sedan before braking and backing off.

11. Trooper Pelster took several stopwatch readings on the following distance, ranging from .5 - .8 of a second.

12. As a result, Trooper Pelster made a traffic stop on the Chevrolet Suburban bearing Illinois BK34159 at mile marker 398, in Lincoln, Lancaster County, Nebraska.

2

13. Trooper Pelster approached the passenger side of the Suburban, greeted the two male occupants, and explained the reason for the stop.

14. The driver provided his Illinois driver's license that showed his identifying information as: Ali M. Abbasi, DOB 12/10/1975.

15. The passenger also showed Trooper Pelster his Illinois driver's license that showed his identifying information as: Julio J. Martinez, DOB 11/05/1973.

16. In plain sight, Trooper Pelster saw a touch screen cell phone in GPS mode plugged into the USB port and sitting in the center console. That phone and another touch screen cell phone used by Abbasi during the traffic stop belonged to Abbasi.

17. Trooper Pelster also saw Martinez using a touch screen phone during the stop, and that Martinez also had a second phone sitting on his lap.

18. Trooper Pelster saw that Abbasi was wearing a New York City Fire Department jacket with his name on it.

19. Trooper Pelster saw that Abbasi's hands were shaking while handing over the requested documents.

20. Trooper Pelster asked Abbasi back to the patrol unit where he would be issued a warning for speeding.

21. In the patrol car, Trooper Pelster talked with Abbasi as he ran his records checks.

22. Abbasi claimed that he was a volunteer for the NYFD approximately 1 ½ years prior, and said that he had a limo business in Chicago, IL.

23. Trooper Pelster asked Abbasi who the passenger was, and Abbasi identified him as "Peto Hernandez." Trooper Pelster became more suspicious of the pair because the passenger's Illinois driver's license showed his name as "Julio J. Martinez."

24. Abbasi said they were traveling to Las Vegas, NV and would be there "as long as (they) could survive".

25. Abbasi then said that they might be in Vegas for a week.

26. Trooper Pelster noted that Abbasi had rented the Suburban in Chicago at 1415 on June 17, and it was due back to Chicago at 1400 on June 21.

27. A four-day car rental is inconsistent with traveling to Las Vegas and gambling for a week.

28. Abbasi stated they'd decided to go to Las Vegas only the day prior.

29. While Lincoln Communications ran checks, Trooper Pelster left the patrol car and approached Martinez in the Suburban.

30. Trooper Pelster saw that Martinez was on FaceTime with a female whom he identified as his fiancée.

31. Martinez told Trooper Pelster that the trip to Las Vegas had been planned for a while.

32. As a result to the foregoing information, and based on his training and experience as a law enforcement officer, Trooper Pelster believed the following indicated criminal activity when taken as a totality during the scope of the stop:

- Coming from a distribution city (Chicago, IL);
- Traveling to a transportation hub (Las Vegas, NV);
- Large rental vehicle for two people;
- Excessive nervousness that did not subside throughout the entire traffic stop (Abbasi had a rapid/visible heartrate);
- Disclaimer (Abbasi was wearing a NYFD jacket);

- Abbasi did not know the passenger's actual name; and,
- Discrepancies in stories (Abbasi said the trip to Vegas had been planned the day prior, but Martinez said that it had been planned for a while).

33. Trooper Pelster gave Abbasi all of his documents and issued an electronic warning for speeding.

34. As Abbasi began to exit the patrol unit Trooper Pelster asked Abbasi if they could speak further, and Abbasi agreed to the request.

35. Abbasi denied being in possession of or transporting drugs, guns, or contraband.

36. Trooper Pelster asked Abbasi if there was a large amount of U.S. currency in the Suburban, and Abbasi stated there was not.

37. Based on Trooper Pelster's training and experience, he believed there to be a large amount of drug proceeds in the Suburban.

38. As a result Trooper Pelster requested consent to search the rented Suburban.

39. Abbasi denied consent to search and also would not consent to remain at the traffic stop until a K9 could be deployed on the Suburban.

40. After Abbasi denied consent to search, Trooper Pelster called for a K9 and, due to the aforementioned indicators of criminal activity when taken as a totality, Trooper Pelster detained Abbasi.

41. Trooper Pelster approached Martinez, still seated inside the Suburban.

42. Martinez also claimed that there was nothing illegal in the Suburban, denied being in possession of a large amount of currency, and denied that there was a large amount of currency in the Suburban.

43. Martinez granted Trooper Pelster consent to search his property.

44. Trooper Pelster explained to Martinez that a K9 had been summoned to the traffic stop to conduct a sniff on the Suburban, and Martinez replied, "Okay."

45. Trooper Pelster placed Martinez inside his patrol unit with Abbasi.

46. Lancaster County K9 Sgt. Jason Mayo arrived at the stop and deployed his K9, which indicated to the odor of drugs emitting from within the Suburban.

47. Law enforcement conducted a probable cause search of the Suburban.

48. The search revealed a large, heat-sealed package of rubber-banded U.S. currency was located in the rear quarter panel on the driver's side. This type of concealment and manner of packaging is consistent with multiple other drug currency cases Trooper Pelster has conducted over the course of his 20-year career. Several of these involved contraband (including drug currency) concealed in the rear quarter panels of vehicles.

49. Law enforcement also found located another phone in Martinez's backpack, along with personal use marijuana products, and an additional rubber-banded bundle of U.S. currency totaling $10,000, which was also seized.

50. The estimated amount of suspected drug proceeds seized from the rear quarter panel was $100,000.

51. Law enforcement seized all phones that were in the Suburban and placed them into evidence.

52. Law enforcement detained Abbasi and Martinez and transported them to the Headquarters Patrol Office.

53. At the Headquarters Patrol Office, Trooper Pelster briefed Investigator Jessica Wenzl regarding the stop and investigation and gave Abbasi's operator's license to Investigator Wenzl.

54. Investigator Wenzl went to the interview room to talk to Abbasi and told Abbasi that Trooper Pelster told her (Wenzl) that Abbasi claimed he did not know there was any money concealed in the Suburban (rented by Abbasi).

55. Investigator Wenzl read the Nebraska State Patrol Advice of Rights to Abbasi.

56. Abbasi said he wanted a lawyer present and would not answer any questions without a lawyer.

57. Upon concluding the interview, Abbasi freely volunteered information regarding a limo company he owned. Abbasi said he started the limo company over 15 years ago, and also said that he owned restaurants.

58. Abbasi also said it was the wrong day to wear the fleece jacket he was wearing, that displayed a New York City Fire Department logo and his name. Investigator Wenzl asked if Abbasi was a firefighter and Abbasi replied that he volunteered for several years.

59. Investigator Wenzl told Abbasi that he should be proud of his service to which Abbasi seemed to scoff.

60. Law enforcement moved Abbasi into the holding room where Martinez was waiting and escorted Martinez into the Interview Room.

61. Investigator Wenzl then talked to "Julio" J Martinez (as indicated on his operator's license).

62. Martinez seemed quite sluggish so Investigator Wenzl asked Martinez if he was okay.

63. Martinez said he needed his blood pressure and diabetes medication and told Wenzl where she could find the medications in his belongings.

64. Investigator Wenzl retrieved the medications for Martinez who quickly took three different medications.

65. Investigator Wenzl told Martinez that Trooper Pelster told her (Wenzl) that Martinez had claimed that he did not know there was any money concealed within the Suburban.

66. Martinez replied, saying he did not know there was money concealed in the Suburban.

67. Investigator Wenzl then read the Nebraska State Patrol Advice of Right to Martinez.

68. Martinez' response was to express that he was upset that he was being held without being able to make a phone call and claimed that he did not even know where he was (the name of the city).

69. Investigator Wenzl attempted to explain what was happening to Martinez, but Martinez said he would not answer any questions without an attorney.

70. Martinez asked to use the restroom, and as he was walking to the restroom, Investigator Wenzl saw that Martinez was walking in a slow, stiff, deliberate manner. Martinez said he needed to go back to driving but said he was not an over the road truck driver, just a local driver.

71. Troop Pelster told Abbasi and Martinez that they would be released, but that much of the property they had in their possession was going to be seized pending investigation, including five (5) iphones.

72. Criminals often use digital device/media to communicate with accomplices and will sometimes store accomplices' contact information in a digital format. These

communications can occur through electronic mail (e-mail), instant messaging/text messaging, social media accounts, cloud storage accounts, and/or phone calls.

73. A narcotic distribution structure of any size will use computers/equipment, cell phones, and digital media for the purpose of contacting sources and distributors from the top of the pyramid to the base of the pyramid and vice versa to discuss openly or in cryptic fashion the supply, cost, quality, distribution, transportation, or payments involved in marketing and distributing narcotics.

74. In addition, when a personal meeting between conspirators occurs, cell phones and digital media is often used to arrange and arrange and/or verify the meeting.

75. Abbasi was very cooperative and did not contest the decision.

76. Martinez, however, wanted his phone and was verbally displeased about not being able to leave with it.

77. Law enforcement gave Martinez his backpack.

78. Martinez asked where his money was and how he was supposed to get home.

79. Trooper Adam Strode told Martinez that there was still several hundred dollars in his wallet, and Martinez responded that he always has several hundred dollars in his wallet.

80. Martinez was upset that his ipad and his headphones were not in his backpack, and Trooper Brandon Wilkie told Martinez that both items were left in the rental vehicle.

81. Martinez was upset that law enforcement was not returning his CBD/oil products, saying that he uses the products for his knees.

82. Trooper Pelster also seized the GPS tracking device located in the center console of the Suburban.

83. Abbasi and Martinez both denied ownership or knowledge of the U.S. currency located in the rented Suburban.

84. The official bank count of the seized U.S. currency was conducted on June 21, 2019, which showed an official total of $110,000.

## Claim for Relief

85. The United States repeats and incorporates by reference paragraphs 1 through 84 above.

86. Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), which provides for the forfeiture of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

87. By the foregoing and other acts, the defendant property constitutes moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. § 801, *et seq.*, and therefore, is forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6).

88. By the foregoing and other acts, the defendant property constitutes proceeds traceable to an exchange for a controlled substance or listed chemical in violation of 21 U.S.C. § 801, *et seq.*, and therefore, is forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6).

89. By the foregoing and other acts, the defendant property constitutes moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of 21

U.S.C. § 801, *et seq.*, and therefore, is forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE the United States of America prays the defendant property be proceeded against for forfeiture; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the defendant property; and for such other and further relief as this Court may deem just and equitable.

        UNITED STATES OF AMERICA,
        Plaintiff

        JOSEPH P. KELLY
        United States Attorney

By:   *s/ Amy B. Blackburn*
        Amy B. Blackburn (MO#48222)
        Assistant U.S. Attorney
        1620 Dodge Street, Suite 1400
        Omaha, NE 68102-1506
        Tel: (402) 661-3700
        E-mail: amy.blackburn@usdoj.gov

## VERIFICATION

I, Kurt Frazey, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the United States Drug Enforcement Administration (DEA) and Sergeant with the Nebraska State Patrol that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs 7 through 84 of the Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer with DEA.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: December 2, 2019

_____
Kurt Frazey
Task Force Officer
U.S. Drug Enforcement Administration