## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

$110,000.00 IN UNITED STATES
CURRENCY,

        Defendant,

   and

JULIO MARTINEZ,

        Claimant.

8:19-CV-531

MEMORANDUM AND ORDER

This matter is before the Court on the government's motion for summary judgment (filing 95) in this action for forfeiture *in rem*. Julio Martinez, the claimant in this action, opposes the government's motion, asserting he is the legitimate owner of the currency. For the following reasons, the Court will deny the government's motion.

## BACKGROUND

On June 18, 2019, Sergeant Pelster of the Nebraska State Patrol stopped a vehicle on Interstate I-80 in Lancaster County, Nebraska, for speeding. Filing 96 at 1. The driver, Alil (Ali) Abbasi, provided a rental agreement for the vehicle and said that he and his passenger—who he identified as both "Pito" and Martinez Hernandez, but who law enforcement identified as the

claimant Julio Martinez—were coming from Chicago and heading to Las Vegas. Filing 96 at 2-5; filing 99 at 2.[1]

According to the government, during the stop, Abbasi and Martinez gave Pelster inconsistent and suspicious statements about their trip, including how long it had been planned, why they did not fly, and how long they planned to stay. Filing 96 at 3-4. For example, Abbasi claimed the pair did not fly because the trip was "last minute" and he liked being on the road. Filing 96 at 3. As for their accommodations, he told Pelster that they were planning to stay as long as they could survive and would probably "catch the Venetian." Filing 96 at 3. Conversely, Martinez said the trip had been planned for a while, and that they drove because as a "big guy" he doesn't like to fly. Filing 96 at 4.

Because of these perceived inconsistencies, Pelster further questioned the men about the timeline of their trip. And after considering the time of the stop and the length of the trip, it was determined that if Abbasi and Martinez intended to return the rental vehicle to Chicago by 2:00 p.m. on June 21, 2019, as listed on the rental agreement, they would have just over 24 hours in Las Vegas. Filing 96 at 4-5 . When confronted about the timeline, Abbasi explained that he could renew the rental agreement if needed, and that booking the car this way allowed him to avoid paying the entire cost up front. Filing 97-2 at 9:30-9:50. Pelster also asked both men if there were any large amounts of

---

[1] The government argues that its statement of material facts should be deemed admitted in its entirety based on Martinez's failure to follow the Court's summary judgment procedures. Filing 102 at 1-2; see NECivR 56.1. The Court is certainly disappointed by the inattention of the plaintiff's counsel to this Court's rules. Nonetheless, the Court has reviewed the record and will not deem facts to have been admitted where the claimant's argument and the record provide a meaningful basis to consider them meaningfully contested.

currency in the vehicle. Abbasi said he had "a little cash" on him, but that there were no large amounts of currency in the vehicle. Filing 96 at 4-5; filing 97-2 at 20:50-20:56. In fact, he said that he only had a couple hundred bucks on him because "nobody carries cash nowadays." Filing 97-2 at 21:18-21:26.

According to Pelster, Martinez also denied that there were large amounts of cash in the vehicle. Filing 96 at 6. And on the video footage of the traffic stop, after Pelster asked Martinez the question, Pelster can be heard saying "no, are you sure," implying that Martinez said there was not any currency in the vehicle, filing 97-2 at 42:14-42:30. In reviewing the video footage of the traffic stop, however, the Court was unable to hear Martinez's response itself over the noise of traffic in the background. *See* filing 97-2 at 42:14-42:30. And at his deposition, Martinez testified, "I just didn't say nothing" when asked about his response to Pelster's question. Filing 96 at 41; filing 97-10 at 35.

Based on the information gathered during the stop, Pelster believed reasonable suspicion of criminal activity existed, so he requested a K9 unit. Filing 96 at 5. After the dog gave a positive alert, the vehicle was searched, revealing "large, heat-sealed plastic packaging [containing] . . . U.S. currency in the rear quarter panel on the driver's side." Filing 96 at 6. This was later determined to be $100,000, some of which was rubber-banded and some which was in paper bank bands from Byline Bank. *See* filing 96 at 6; filing 98 at 6. In addition, six cell phones were found. Filing 97-1 at 9-10.

According to the government, law enforcement also found several items in Martinez's backpack: an additional $10,000, personal use marijuana products, a cell phone, and receipts from previous travel. Filing 96 at 7. The government also provided a statement from Pelster indicating that marijuana

products were found, filing 96 at 7; filing 97-1 at 9, and photos documenting the contents of Martinez's backpack. Filing 97-7. But, in reviewing the photos, the Court did not see any marijuana or items that could be considered marijuana products. Additionally, a Nebraska State Patrol report summarizing what occurred on the day of the stop states that Martinez described the products as "CBD/oil products" used "for his knees." Filing 97-16 at 11. And Martinez averred that no *narcotics* were found in the vehicle, emphasizing that no criminal ticket was issued in relation to the stop, implying he was not charged for being in possession of any controlled substances. Filing 98 at 5.

After the currency was found, both Abbasi and Martinez were taken to the Nebraska State Patrol headquarters for questioning. Filing 96 at 7. Before requesting an attorney, Abbasi indicated to investigators that he was completely unaware of the money in the vehicle. Filing 96 at 8; filing 97-15 at 23:40-23:45. Conversely, Martinez claims that during his interview at the headquarters he never disclaimed the $110,000, but instead, "simply asked for a lawyer." Filing 99 at 5. However, video evidence shows that when Martinez was asked specifically about the money, he claimed the only things he had were "in his bag." Filing 97-15 at 44:30-44:47. And later in the interview, when Martinez was told that the $100,000 would be seized, he again said that he did not know anything about that money, but did affirmatively state that the $10,000 found in his backpack was from his Chase Bank account. Filing 96 at 8; filing 97-15 at 1:13:19-1:13:55. After both men refused to answer further questions without an attorney present, they were released without criminal charges; however, the $110,000 was seized at that time.

4

In October 2020, Martinez was deposed about the matters in this case and claimed, for the first time, that the $100,000 was also his money, which he had secured through a private loan from his business associate, William Madden, in order to purchase a home. Filing 97-10 at 20-21; *see* filing 99 at 2. Martinez's deposition statements about the $10,000 located in his backpack were not as clear, as he claimed at one point that it was his money, filing 97-10 at 45-46, and later that it "came out of the big bundle of the $100,000." Filing 97-10 at 57. But in his subsequent answers to the government's special interrogatories, Martinez claimed, as he does now, that he received "$100,000 of these monies from William Madden through a loan" while "[t]he remaining $10,000 were taken from [his] earnings [as a chauffeur] and was from [his] Chase banking account." Filing 97-17 at 2; *see* filing 99 at 4.

Records from Martinez's Chase Bank account do show a $21,000 deposit with a description of "St Fire" made in March 2019, which he allegedly received after a fire at his rental home. Filing 97-20 at 6. And according to Martinez, the $100,000 loan arose after he and Madden had already "had a business relationship . . . for many years, including handling limo service for Mr. Madden's clients and serving as a driver for Mr. Madden." Filing 99 at 2. In reference to this business relationship, Martinez noted that the $15,000 deposit to his Chase Bank account in April 2019 was from Madden for "services rendered." Filing 97-10 at 40; *see* filing 96 at 14, 41; filing 97-20 at 14-15. When Martinez was unable to secure traditional financing to purchase a home, he allegedly turned to Madden. Filing 99 at 3. And to support his claim that Madden agreed to loan him the money, Martinez provided an alleged loan agreement between him and Madden for $100,000, filing 97-31, and copies of emails allegedly between him and mortgage consultant Patrick McClain in

5

January 2019, in which the pair discussed getting Martinez pre-qualified for financing to purchase a property. Filing 98 at 36-44; filing 99 at 3.[2]

Additionally, employees of a Byline Bank branch in Chicago said that on June 10, 2019, "William Madden entered the bank with a duffel bag containing U.S. currency bills in denominations of $20s, $10s, $5s and $1s [and] Madden requested larger bills in exchange for the smaller denominations totaling $100,000." Filing 96 at 18. Madden allegedly said that the "currency was from a commercial food event and on occasions his business primarily gets paid in cash, which they hold on to." Filing 96 at 18. Ultimately, Madden proceeded with the transaction even though the bank was only able to exchange $50,000 of his currency for larger bills. Filing 96 at 18-19.

At that time, Madden allegedly refused to explain why he wanted to exchange the money. Filing 96 at 18. However, when the bank called him three days later to inform him they received the currency necessary to exchange his additional $50,000—a service which he refused—Madden allegedly explained to the employee that he "earns over $2.2 million a year and over the years, has accumulated money that he keeps in a safe," some of which he was exchanging for a "'friend' who asked for larger bills." Filing 96 at 18-19. But tax information produced by Madden shows that his 2019 adjusted gross income was $189,435, while his 2018 adjusted gross income was $105,866. Filing 96 at 23. When the

---

[2] Martinez also provided copies of property listings he allegedly received from both a real estate agent and the online source "Zillow" to prove that the money was a home loan from Madden and that he was planning to purchase a home. However, since all of these documents were received by Martinez *after* the stop, they do provide any support for his assertion that, at the time of the stop, he was looking for homes to purchase with the $100,000. *See* filing 98 at 10-35.

government attempted to depose Madden about the loan agreement with Martinez, he invoked his rights under the Fifth Amendment, stating that "answering the question[s] may incriminate me." Filing 96 at 23; filing 97-32 3-13.

As for the trip to Las Vegas, Martinez said that after he told his friend Abbasi about the $100,000, the men decided to take a trip to Las Vegas to gamble and "flip" the cash into "a little extra money." Filing 96 at 9; filing 97-10 at 31-32; filing 98 at 5. Martinez also claims he packaged and stored the money in the rental vehicle as it was found to prevent it from being misplaced and to make sure it was secure in case someone broke into the vehicle. Filing 99 at 4.

In support of its motion, the government has provided additional evidence which it believes supports its claim that the currency is substantially related to drug activity. First, the loan agreement provides that the loan was to be repaid in twelve months in "the lawful currency of the Commonwealth of Australia." Filing 96 at 17. And although such a loan would require monthly payments of approximately $8,333, Martinez's tax records show that in the four years preceding the stop he "had approximately $87,282 total net income." Filing 96 at 13-14.

Additionally, cell phone and other records show that despite Martinez's claims that he doesn't like to fly, he flew to Los Angeles, California on multiple occasions prior to the stop, including a one day trip in February 2019 and a later trip in May 2019, the latter of which Martinez alleges was a family trip to Disneyland. Filing 96 at 19-20. While Martinez was in California for his purported Disneyland trip, he withdrew $27,000 from his Chase Bank account allegedly to "have a ball with [his] kid." Filing 96 at 20. However, Martinez's

7

cell phone records during that time show he was in California from May 31, 2019 to June 4, 2019, but that he was only in Anaheim—where Disneyland is located—for seven hours at most during that period. Filing 97-26 at 102-03; *see* filing 96 at 20-21.

Finally, one of the cell phones located in the vehicle contained communications in which the user of the cell phone—who was referred to as "Pito" in several messages—appeared to be arranging sales of marijuana and THC products. Filing 104-4 at 3-6. And the claimant admitted to the Court that his nickname is "Pito." Filing 99 at 2.

In sum, Martinez argues that the government has no direct evidence that any of the $110,000 seized is substantially linked to drug activity, and instead, that his evidence shows he was in possession of the currency for legitimate reasons. Filing 99 at 5. Ultimately, Martinez emphasizes that he has never known Madden or Abbasi to be involved in illegal drug activity, that he is not involved in such activity, and that his last criminal conviction was in 2000. Filing 99 at 1-5. Conversely, the government asks the Court to grant its motion for summary judgment, arguing that no genuine issue of material fact exits regarding the substantial connection between the currency and illegal drug activity. Filing 96 at 27-28.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate

8

the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

DISCUSSION

To successfully effectuate the forfeiture of seized currency under 21 U.S.C. § 881, the government bears the initial burden of proving, by a preponderance of the evidence, that a substantial connection exists between the seized currency and drug activity. *United States v. $63,530.00 in U.S. Currency*, 781 F.3d 949, 955 (8th Cir. 2015); *United States v. $84,615 in U.S.*

9

*Currency*, 379 F.3d 496, 501 (8th Cir. 2004) (citing 18 U.S.C. § 983(c)(1) and (3)). In deciding whether the government has satisfied this burden, courts must consider the totality of the circumstances. *$63,530.00 in U.S. Currency*, 781 F.3d at 955. But the government need not prove the seized currency is linked to any particular drug transaction, and may carry its burden of proof using circumstantial evidence. *$48,100.00 in U.S. Currency*, 756 F.3d 650, 655 (8th Cir. 2014).

Possession of large amounts of currency provides strong evidence of a connection between the currency and drug activity. *$63,530.00 in U.S. Currency*, 781 F.3d at 955. Other circumstantial evidence that helps prove a substantial connection may include a drug dog's alert, the particular packaging of the currency, or a claimant's behavior during a traffic stop, as well as strange travel patterns and false statements to law enforcement officers. *Id.*; *U.S. v. $124,700 in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006). And if such circumstantial evidence, when considering the totality of the circumstances, shows, by a preponderance of the evidence, a substantial connection between the seized currency and drug activity, then forfeiture may be proper even if "the claimant was not charged with a crime and no drugs were found in the vehicle." *63,530.00 in U.S. Currency*, 781 F.3d at 958 (citing *$124,700 in U.S. Currency*, 458 F.3d at 826; *United States v. $117,920.00 in U.S. Currency*, 413 F.3d 826, 829 (8th Cir. 2005)).

Under 18 U.S.C. § 983(d), if the government meets its burden of proving a substantial connection between the seized currency and drug activity, a claimant may still defeat the forfeiture by proving, by a preponderance of the evidence, that he is an innocent owner of the currency. *$63,530.00 in U.S. Currency*, 781 F.3d at 956. An innocent owner is one who is either unaware of

10

the drug activity giving rise to the forfeiture or one who, upon learning of the drug activity, "did all that reasonably could be expected under the circumstances to terminate such use of the property." *Id.* (citing 18 U.S.C. § 983(d)).

In the instant case, law enforcement located $110,000 in the rental vehicle, $100,000 of which was vacuum sealed and stored in the rear quarter panel. And while a large sum of money, in and of itself, can provide strong evidence of a connection between the currency and drug activity, at this stage, the Court must consider *the totality of the evidence in the light most favorable to the claimant* when deciding if the government has met its burden as a matter of law. It is with this lens that the Court must analyze the evidence in the record.

As alluded to above, in attempts to tie the currency to drug activity, the government notes the "suspicious" travel itinerary of the men—that they were traveling between cities known for drug activity, that they made unclear and inconsistent statements about their travel plans, and that based on the terms of the rental agreement the men would have less than 24 hours in Las Vegas.

First, while it is true that courts should consider whether the seized currency was being transported between "drug source" and "drug destination" cities, *U.S. v. $141,770.00 in U.S. Currency*, 157 F.3d 600, 604 (8th Cir. 1998), this Court must also consider that both men have claimed to be from Chicago, *see* filing 96 at 2; filing 99 at 2, and have offered an explanation for their travels to Las Vegas. Specifically, both men told law enforcement they were traveling to Las Vegas for vacation and to gamble. Filing 97-2 at 5:00-5:40; filing 97-10 at 31-32, 56.

11

Additionally, in reviewing the evidence, a jury could certainly conclude, based on its assessment of Martinez's credibility, that his statements about the men's travel itinerary are simply inconsistent. However, when drawing all reasonable inferences in Martinez's favor, the fact finder could also conclude from these statements that Martinez had been wanting to travel to Las Vegas with friends "for a while," and when the opportunity arose, he decided to take the last minute trip. But that is a question for the finder of fact. In sum, while aspects of the men's itinerary—when viewed in the light most favorable to the government—may seem "suspicious" and lend support to the conclusion that the money was substantially connected to drug activity, when the Court *views the evidence in the light most favorable to Martinez and abstains from credibility judgments*, as it must, there are genuine issues of material fact regarding the purpose of the men's trip to Las Vegas and the legitimacy of their alleged timeline.

In addition to the men's allegedly suspicious travel itinerary, the government points to the positive drug dog alert to argue it has met its burden for forfeiture as a matter of law. And although this may have some probative value in establishing a connection between the currency and drug activity, at most it provides a "slight indication," *U.S. v. $84,615 in U.S. Currency*, 379 F.3d 496, 502 (8th Cir. 2004), as "it is well-established that an extremely high percentage of all cash in circulation in America today is contaminated with drug residue." *Muhammed v. Drug Enf't Agency, Asset Forfeiture Unit*, 92 F.3d 648, 653 (8th Cir. 1996) (citation omitted).

Further, though a claimant's possession of personal use marijuana at the time of the currency's discovery may establish a connection between the currency and illegal drug activity, *see $84,615*, 379 F.3d at 501-02; *United*

*States v. $39,873.00,* 80 F.3d 317, 319 (8th Cir. 1996), as outlined above, there is a question of fact as to what substance Martinez actually possessed. Although Pelster claims that "personal use marijuana products" were located in Martinez's backpack, filing 96 at 7, the photos cited in support of this claim do not clearly display any personal use marijuana. *See* filing 97-7. And this evidence must be viewed in conjunction with Martinez's claims that: (1) there were no narcotics located in the vehicle and (2) he did not receive any criminal charges in relation to the stop, including for possession of a controlled substance. Filing 99 at 4. Additionally, the Supplemental Report authored by the Nebraska State Patrol notes that Martinez described the substance as CBD/oil products used "for his knees." Filing 97-16 at 11. Viewing this evidence in the light most favorable to Martinez, there is a question of fact as to what substance—CBD or marijuana—was actually located in his backpack. And this distinction could impact inferences the fact finder would draw concerning the connection between the currency and illegal drug activity. Ultimately, these are questions for the finder of fact.

In addition to there being questions of fact regarding the purpose of the trip to Las Vegas, the legitimacy of the itinerary, and the substance located in Martinez's backpack—all of which are critical pieces of circumstantial evidence—a material question of fact also exists regarding the origin of the currency. Specifically, the government argues the evidence in the record demonstrates both a substantial connection between the currency and drug activity, and that Martinez's explanation regarding the currency is implausible, warranting summary judgment. *See* filing 96 at 27. In making this argument, the government reasons that:

13

> [the] Claimant's story is transparently concocted. It is as fictional as the fraudulent Loan Agreement (for Australian currency to be repaid within 12 months). No logical person (or very, very, very good friend) would loan another person with net income each year of under $37,000, a whopping $100,000, cash, and expect to ever receive monthly payments of $8,333. . . . It is inconceivable that [Madden] would essentially "give" over half his annual income, $100,00 to a "friend" with no realistic expectation of repayment.

Filing 96 at 41-42. And while this scenario may seem implausible when viewed in a vacuum, other evidence in the record supports Martinez's claim that this was, in fact, the agreement between the men, as unwise as it may seem.

When viewed in the light most favorable to the government, the loan agreement appears to contain questionable terms that call its authenticity into question. And the government will have an opportunity to present those terms to the fact finder, who may ultimately agree the document is fraudulent. But again, that is a question best left to the jury considering Martinez's alternative explanation regarding the loan agreement and its terms.

According to Martinez, Madden was both a "friend" and someone who he had a business relationship with for "many years." Filing 97-10 at 20; filing 99 at 2. And despite the clear terms of the agreement outlined in the document, he alleges that the arrangement between the men was less stringent in practice—he felt no pressure about the repayment because he did "a lot of work for [Madden]," which would have allowed him to work off his debt, and Madden said to "pay extra on the side" if he could. Filing 97-10 at 20. In referencing his work for Madden, Martinez noted the $15,000 deposit he allegedly received from Madden in April 2019 for services rendered.

14

And although the government argues it is suspicious that Martinez has failed to keep track of how much work he has done for Madden since the money was seized in order to pay back the loan, filing 96 at 41, Martinez alleged that the agreement between the men changed drastically after the money was seized. *See* filing 97-10 at 25-26. Specifically, Martinez explained that once Madden "realized that it wasn't my fault . . . he just decided to just continue letting me work it off driving him." Filing 97-10 at 25-26. Since Madden felt bad for him, he allegedly did not charge Martinez interest or demand payment as stated under the loan agreement. Filing 97-10 at 25-26. Instead, Martinez claims he has been driving Madden and his kids whenever they need, without asking "what or where," to pay it back, which is what you do when "you owe somebody who did you a favor." Filing 97-10 at 26. However, Martinez also noted that Madden reduced his travel significantly during the COVID-19 pandemic, which is another reason why he hasn't closely tracked the amount he has driven Madden since the money was seized. Filing 97-10 at 26.

In sum, according to Martinez, the terms of the agreement have not been enforced since the money was seized, and Madden has been trying to keep Martinez's spirits up throughout the process. Filing 97-10 at 28-29. Overall, although it may not seem like a logical loan arrangement given Martinez's historical income, when the evidence is viewed in light most favorable to Martinez, a reasonable jury could find, based on their determination of Martinez's credibility and other evidence in the record, that a loan agreement existed between friends and longtime business associates, and while the terms of the agreement were memorialized in writing, it was handled more informally in practice.

15

Overall, there is plausible evidence to support each party's explanation regarding the origin of the currency. And while it is true that Martinez seemingly denied ownership of the $100,000 on the day of the stop, and inconsistent statements regarding large amounts of currency can be evidence of a connection to illegal drug activity, the Court cannot conclude that forfeiture is proper as a matter of law when other evidence in the record, when viewed in the light most favorable to Martinez, could reasonably be construed as supporting a plausible, alternative explanation that Martinez was in lawful possession of the currency. Even if one explanation may seem *more* plausible than the other, it is up to the fact finder to decide which explanation it believes.

The government also argues that forfeiture is appropriate as a matter of law given the adverse inference that can be drawn from Madden's invocation of the Fifth Amendment when asked about the loan agreement and his relationship with Martinez. Filing 96 at 42; filing 102 at 11. The Court does not find that this invocation, when viewed in the totality of the circumstances, warrants a judgment for forfeiture as a matter of a law. The Supreme Court has held that, in a civil case, an adverse inference may be drawn when a party invokes the Fifth Amendment and refuses to testify in response to evidence offered against them. *Baxter v. Palmigiano,* 425 U.S. 308, 320 (1976). Later, the Eighth Circuit noted that such inference can also be drawn in a civil case when a non-party witness invokes the Fifth Amendment. *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 521 (8th Cir. 1984). However, the adverse inference drawn from a witness's silence is insufficient, on its own, to support a decision against the Claimant. *See Pagel, Inc. v. SEC,* 803 F.2d 942, 947 (8th Cir. 1986) (citing *Baxter* 425 U.S. at 317). Instead, the adverse inference is

"*only one of a number of factors to be considered by the finder of fact*" in weighing the evidence. *Id.* (emphasis added).[3]

In the instant case, given Madden's central role in determining the legitimacy of the loan, it may be appropriate to present his invocation to the finder of fact during trial. *See Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1480-82 (8th Cir. 1987). However, the fact finder can only meaningfully decide what weight to give Madden's silence once it has determined the genuine issues of material fact outlined above. Only then can the fact finder decide, in light of all the factors, whether Madden's invocation is an additional factor weighing against Martinez given the totality of the circumstances.

Lastly, in reviewing Eighth Circuit precedent, the Court notes many factual similarities between the present case and *U.S. v. $124,700 in U.S. Currency*, 458 F.3d 822 (8th Cir. 2006). In that case, $124,700 was found in a rental vehicle during a traffic stop. *Id.* at 824. The driver alleged that he was driving from Chicago to California, and that he chose to drive because he was fearful to carry the cash back by plane. *Id.* The currency was found in a large plastic bag, and in total there were "seven bundles wrapped in rubber bands inside aluminum foil packaging." *Id.* Ultimately, two men, in addition to the driver, claimed that they had contributed personal cash savings and borrowed money, totaling $124,7000, to buy a refrigerated truck from a buyer in Chicago, and that the money was being returned to California after the truck was sold to another buyer. *Id.* And when asked why the currency was concealed in

---

[3] The Court also notes that given the disparity between Madden's claimed business activities and his tax returns, there are alternative explanations for his invocation of his Fifth Amendment rights that don't necessarily involve controlled substances.

plastic and foil, the driver testified he hid it "because he was afraid that he might be assaulted or have the money stolen if it was readily observable." *Id*.

In arguing forfeiture was proper, the government also noted that the claimant told officers there were no large amounts of currency in the vehicle when asked before the search. *Id*. Later, however, the claimant said "he lied about the money and about the names of other parties involved because he believed that carrying large amount of cash might be illegal, and he did not want to get his friends in trouble." *Id*. at 825. In reversing the district court's *judgment* in favor of the claimant, the court held that "[w]hile the claimants' explanation for these circumstances may be 'plausible,' we think it is unlikely." *Id*. at 826.

In *U.S. v. $84,615 in U.S. Currency*, the Eighth Circuit affirmed a district court's *judgment* for forfeiture after approximately $80,000 of plastic wrapped currency was found in a vehicle with illegal drugs,  and a drug dog gave a positive alert to the currency. 379 F.3d 496, 498, 502 (8th Cir. 2004). In affirming the district court's decision, the court considered these facts in conjunction with its determination that the claimant's *credibility* (or lack thereof) undermined his assertion that the currency was his "life savings." *Id*. at 501-02.

There is no doubt that in the instant case the government has a substantial amount of evidence to present at trial similar to that adduced in *$124,700 and $84,615*, including the men's alleged travel route and itinerary, the drug dog alert, the manner in which the currency was concealed, Martinez's seemingly inconsistent statements about his ownership of the currency, the specific terms of the loan agreement, the text messages allegedly sent by "Pito,", the substance found in Martinez's backpack, and Madden's

18

invocation of the Fifth Amendment. However, as in *$124,700* and *$84,615*, assessments of Martinez's *credibility* and the *weight* of this evidence will be critical in determining issues material fact central to the outcome of this case. And summary judgment is not the proper time for the Court to weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issues. *Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. Co.,* 536 F.3d 939, 943-44 (8th Cir. 2008).

And this is not a case like *United States v. $7,969.00 in U.S. Currency*, where the Eighth Circuit affirmed the district court's decision to grant the government's motion for summary judgment in a civil forfeiture proceeding. 587 Fed. Appx. 352, 353 (8th Cir. 2014) (per curiam). There the government's evidence showed that the large amount of currency seized was in close proximity to other evidence of drug trafficking, the claimant gave inconsistent statements about the money, and known drug traffickers provided affidavits testifying to the claimant's recent drug-trafficking activity, while the claimant did not submit evidence materially refuting the government's case or proving his assertions that the money came from legitimate sources. *Id*. Notably, in the instant case, Martinez has not been convicted of criminal activity since 2000, and he has presented evidence that, when viewed in the light most favorable to him, could allow a reasonable jury to conclude that a loan agreement existed between him and Madden for the $100,000.

In conclusion, when the evidence is viewed in the light most favorable to Martinez, there are genuine issues of material fact regarding, among other things, the reason for Martinez's travel to Las Vegas, the legitimacy of the loan agreement, and whether the $10,000 was part of his insurance payout, all of which are critical to the ultimate question of whether there is sufficient

evidence to prove the currency is substantially connected to drug activity. Therefore, the government's motion for summary judgment is denied.

IT IS ORDERED that the government's motion for summary judgment (filing 95) is denied.

Dated this 3rd day of May, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge